**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **HOMEOWNERS CHOICE, INC.,**<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>**AON BENFIELD, INC.,**<br><br>　　　　　　Defendant. | Case No. 10 C 7700<br><br>Hon. Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Both the Plaintiff and the Defendant have moved for summary judgment in this matter. For the reasons stated herein, the Motions are denied.

### I.　BACKGROUND

Plaintiff Homeowners Choice, Inc. ("Homeowners Choice") is a Florida corporation with a subsidiary, Homeowners Choice Property and Casualty Insurance Company ("Homeowners Insurance"). In order to manage its downside risk on the policies it issues, Homeowners Insurance buys reinsurance; to procure those policies, it entered into an agreement with a reinsurance broker/intermediary, Defendant Aon Benfield ("Aon"). Generally, to place reinsurance for particular insurance company, a broker must be the "broker of record" for that insurer. In broad strokes, reinsurers generally agree to pay intermediaries a fee, but the fee is deducted from the

reinsurance premium payments made by the insurance company, through the broker, to the reinsurer.

Many reinsurance contracts have one-year terms. Although intermediaries also "service" the reinsurance policies, most of a reinsurance intermediary's work on behalf of the insurance company for a particular reinsurance year is completed once the reinsurance coverage is placed. There is typically no separate payment for post-placement servicing.

Homeowners Insurance signed a Broker Authorization Contract (the "Contract") with Aon, designating Aon as its broker of record beginning July 1, 2007. The Contract provided that Aon's broker of record status would continue until Aon resigned, was terminated, or was replaced by a successor broker of record. It also provided that even if Homeowners Insurance terminated Aon's broker of record status, Aon would continue to service the reinsurance contracts that it had placed (unless Homeowners Insurance opted otherwise), and in any event would still receive the "brokerage" (essentially, commission) from those placements.

In 2008, Aon and Homeowners Choice discussed entering into a revenue-sharing agreement so that, under certain conditions, Aon would pay Homeowners Choice some of the commission money that it earned from Homeowners Insurance's reinsurance placements. On November 8, 2008, Aon sent Homeowners Choices an e-mail and draft agreement which would extend for three or five years. (The draft

appears to be, to some degree, a standard draft contract that Aon maintains for multi-year agreements.)

Although the extent of negotiation is unclear, discussions continued into 2009. Through those discussions, the explicit references to a multi-year agreement were removed. (Homeowners Choice notes that the document template title at the bottom of the final agreement reads ". . . Homeowners Choice, Inc. 03-2009 1 yr Term.doc.") Aon admits that it typed up the parties' agreed changes to the contract language, but disclaims that it "drafted" the contract.

Homeowners Choice contends that on February 25, 2009, it "agreed to continue its relationship with [Aon] through the June 1, 2009 renewal and apply lower percentages for the revenue-sharing agreement, which this time, was tied only to a one-year term. . . ." The Court agrees with Aon, however, that this contention is inadequately supported. The parties entered into a revenue sharing agreement on March 31, 2009, and executed the written agreement on April 6 and April 29.

The Agreement provides, almost in its entirety:

> Based on the desire of the parties to establish a long-term mutually beneficial relationship, this Agreement ("Agreement") is entered into on this 31st day of March 2009, between Aon . . . and Homeowners Choice, Inc., including its affiliates . . . ("Client"), under the following terms and conditions:
>
> 1. In consideration for Client appointing Aon Benfield as reinsurance intermediary-broker for the placement and servicing of all reinsurance

       purchased by the Client (the "Subject Business") for the annual period beginning on June 1, 2009 and ending on May 31, 2010 (an "Agreement Year"), [Aon] agrees to share with Client [Aon's] received and earned brokerage revenue derived from the Subject Business, excluding any brokerage paid to corresponding brokers including those affiliated with [Aon] or sub-brokers ("Net Brokerage Revenue") by paying Client an annual fee ("Annual Fee") for the Agreement Year to be calculated as set out in Schedule A.

2. No Annual Fee shall be due for any Net Brokerage Revenue derived from the Subject Business that is less than $1,000,000, nor shall an Annual Fee be payable subsequent to any decision by Client to terminate or replace [Aon] as its reinsurance intermediary-broker for any portion of the Subject Business. In addition, in the event [Aon] is terminated as Client's reinsurance intermediary-broker for any Subject Business prior to the end of the Agreement Year, Client shall promptly reimburse [Aon] for all Annual Fees previously paid by [Aon] under this Agreement. Client agrees to reimburse [Aon] for any and all costs and expenses associated with collecting any reimbursement.

3. Unless otherwise specified in Schedule A, within 60 days after receipt by [Aon] of the last premium payment for the Subject Business for the Agreement Year or within 90 days after the expiration of the reinsurance contract(s) that constitute the Subject Business, whichever is earlier, [Aon] shall provide Client with a report detailing the Net Brokerage Revenue for the Agreement Year and including payment of the Annual Fee. In the event that [Aon] must pay return brokerage to Client's reinsurers, Net Brokerage Revenue will be recalculated and Client will return to [Aon] as soon as reasonably possible any amount due as a result of the recalculation.

Schedule A set forth the percentage of Aon's Net Brokerage Revenue to which Homeowners Choice would be entitled (between 0-40%),

depending on how much net revenue Aon received from Homeowners Insurance's reinsurance placements.

Homeowners Choice did not cancel any of its reinsurance during the Agreement Year. Although satisfied with Aon's service, Homeowners Insurance notified Aon in March 2010, that it would be using a different reinsurance broker for reinsurance placements starting on June 1, 2010. Aon remained the broker of record to service the reinsurance purchased by Homeowners Insurance between June 1, 2009 and May 31, 2010.

On May 14, 2010, Homeowners Choice notified Aon that under the Agreement, it was owed $659,943. Aon maintains that under Paragraph 2 of the Agreement, it owes Homeowners Choice nothing. Both parties have moved for summary judgment.

## II. **LEGAL STANDARD**

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and [the movant] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Illinois law governs. As such, the Court's goal in construing the contract is to give effect to parties' intent; the language of the contract, read as a whole, is the best evidence of that intent. *Thompson v. Gordon*, 948 N.E.2d 39, 46-47 (Ill. 2011). Unambiguous contract terms should be given their ordinary meaning and enforced as written. *See Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir.

2009). Terms susceptible to more than one meaning are ambiguous, and allow a court to consider extrinsic evidence of the parties' intent; ambiguity is a question of law. *Id.; Central Illinois Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213-214 (Ill. 2004). Construing an unambiguous contract is a question of law; construing an ambiguous contract is a question of fact. *Curia,* 587 F.3d at 829.

### III. DISCUSSION

The Court need not linger long on Count II – the parties and the Court agree that Homeowners Choice may not maintain an unjust enrichment claim in the face of an undisputedly valid contract. Accordingly, Count II is dismissed. Each party seeks summary judgment on Count I based on its own interpretation of the contract; the Court turns now to that issue.

#### A. Contract Ambiguity

The threshold question is whether the Agreement is clear as to whether Aon owes Homeowners Choice an Annual Fee for 2009-2010. The parties find the contract unambiguous; the Court disagrees.

#### 1. *"Subject Business"*

The crux of the dispute is the meaning of the term "Subject Business." Aon argues that "Subject Business" refers to all of Homeowner's Choice's (and its affiliates') reinsurance contracts, including those after the Agreement Year. Because Homeowners Insurance switched brokers for 2010-2011, Aon argues, Paragraph 2

excuses Aon from paying an Annual Fee. Homeowners Choice argues that "Subject Business" is limited to the defined "Agreement Year." Because Homeowners Insurance never fired or replaced Aon for the 2009-2010 reinsurance placements, it argues, it is entitled to payment.

The Court is inclined to agree with the other Courts that have construed similar Aon contracts that Aon has the better argument regarding the structure of the definition sentence in Paragraph 1. *See, e.g., Olympus Ins. Co. v. Aon Benfield, Inc.*, No. 11-CV-2607, 2012 WL 1072334, at *3-5 (D. Minn. March 30, 2012). As Judge Schiltz explained in *Olympus*, the Agreement uses a standard method of defining contract terms – placing capitalized words in quotation marks, in parentheses, and after the relevant defining language. *Id.* at *4. Such a structure ordinarily would mean that Subject Business is defined without reference to the next clause, which defines "Agreement Year." This would mean, as Judge Schiltz explained, that Subject Business includes *but is not limited to* reinsurance purchased by Homeowners Insurance during the Agreement Year.

The Court does not agree with Homeowners Choice that this construction "ignores" the second half of the sentence. That the Agreement is generally limited to the Agreement Year does not mean that the definition of "Subject Business" is so limited. That being said, however, the Court agrees with Homeowners Choice that

the Agreement also uses "Subject Business" in ways that support Homeowners Choice's position. One sentence in Paragraph 3 appears to support both parties. It states:

> [W]ithin 60 days after receipt by [Aon] of the last premium payment for the Subject Business for the Agreement Year or within 90 days after the expiration of the reinsurance contract(s) that constitute the Subject Business, whichever is earlier, [Aon] shall provide Client with a report. . . .

The Court agrees with Homeowners Choice that the second use of "Subject Business" makes sense only if that term is temporally limited. Although Aon does not raise the issue, however, the Court notes that Homeowners Choice's construction seems to render the use of both "Subject Business" and "Agreement Year" earlier in the same sentence redundant. Paragraph 3 thus supports both parties' positions. Furthermore, as discussed below, both parties have reasonable arguments that their definition of Subject Business, applied to Paragraph 2, reflects the parties' intent.

Therefore, although the definition sentence in Paragraph 1 more strongly supports Aon, the Court finds that the remainder of the Agreement renders the definition of Subject Business ambiguous. Illinois law, which requires the Court to adopt a fair and reasonable reading of the whole contract, renders the construction of "Subject Business" a question of fact.

### *2. Obligation to Pay an Annual Fee*

The ambiguous definition of Subject Business renders Paragraph 2 equally ambiguous. Paragraph 2 provides that no Annual

Fee is due "subsequent to any decision by Client to terminate or replace [Aon] as its reinsurance intermediary-broker for any portion of the Subject Business." "Client" includes Homeowners Choice and its affiliates. Therefore, if Homeowners Insurance's decision to change brokers for the 2010-2011 year terminated or replaced Aon "for any portion of the Subject Business[,]" no Annual Fee was due.

If Aon is correct and "Subject Business" includes *all* reinsurance contracts, including those after 2009-10, the Court would be inclined to agree with Judge Schiltz that "terminate or replace" includes the decision to switch brokers for a subsequent year. *See Olympus Ins. Co.,* 2012 WL 1072334, at *3, 5-6. This is not a totally preposterous result, because as Aon points out, when the Agreement was made, the Contract between Homeowners Insurance and Aon was of indefinite duration. Furthermore, Aon makes a good point that Homeowners Choice's interpretation of Paragraph 2 – which makes its entitlement to an Annual Fee depend on whether Homeowners Insurance switched brokers *for the 2009-2010 policies* during the Agreement Year – places a large consequence on relatively inconsequential decision: who serviced the policies on which Aon already had earned its commission.

Nonetheless, Homeowners Choice objects (not unreasonably) that Aon's definition creates a "bargain" quite different from the one identified in Paragraph 1, which lists Homeowners Choice's

consideration as making Aon its broker for 2009-2010. Conditioning payment on renewing the relationship for 2010-2011 is also somewhat in tension with the parties' having removed the draft language that clearly created a multi-year agreement, and the fact that the final document name includes the phrase "1 yr term." Homeowners Choice explains those terms that seem to support Aon by noting that the original draft agreement, which was for a multi-year term, was inadequately edited. (It fails to explain, however, why Paragraph 2 was not also negotiated.)

The Court further agrees with Homeowners Choice that the statement in the Preamble (that the Agreement was meant to foster a long-term relationship) cannot bear the weight that Aon places on it. Either party's construction arguably creates an incentive for a long-term relationship — Aon's by making a continued relationship a condition of the Annual Fee, and Homeowners Choice's by giving it a better deal that it would more likely accept in 2009-10 and in future years. (As Homeowners Choice points out, the Agreement was negotiated in part while Homeowners Insurance was deciding whether to use Aon as its 2009-2010 broker.) The Preamble does not eliminate the ambiguity in the definition of Subject Business and its application in Paragraph 2.

Each party offers other suggested "purposes" for the Agreement – for example that it rewarded Homeowners Choice for its past patronage, or that Paragraph 2 partially compensates Aon for lost

income if Homeowner's Insurance switched brokers. Neither account finds much support in the Agreement or in the parol evidence provided to the Court, however.

Homeowners Choice finally argues that its interpretation must be correct, because Aon's construction makes Paragraph 2 violate Illinois law, or constitute an unenforceable penalty or forfeiture clause. As discussed below, however, the Court agrees with Aon that Paragraph 2 creates a condition precedent to Aon's obligation to pay, and therefore that the Court is not compelled to adopt Homeowners Choice's construction as a matter of law.

### a. Penalty Clause

Homeowners Choice argues that, given that Homeowners Insurance had an undisputed unfettered right to appoint a new broker at any time, Aon's construction of Paragraph 2 constitutes an unlawful penalty clause or works an impermissible forfeiture on Homeowners Choice. (Forfeiture implies losing something formerly owned, or being kept from acquiring something for which one has already substantially paid; penalty suggests the imposition of liability beyond the damage caused by a breach of a primary obligation. 42 *Williston on Contracts* §42:1 (4th ed. 2004 supp., Richard A. Lord ed.).) Homeowners Choice argues that Aon could have explicitly contracted for a penalty or forfeiture clause, but did not, and that no such clause was agreed upon by the parties.

There is no dispute that a penalty clause (as opposed to a reasonable liquidated damages clause) is unenforceable in Illinois, and that Illinois courts narrowly construe contracts to avoid forfeiture if possible. Nonetheless, where a forfeiture provision is clear and properly invoked, it will be enforced. *See Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 715 (7th Cir. 1985); *Cala v. Gerami,* 484 N.E.2d 1199, 1201-02 (Ill. App. Ct. 1985).

Although neither party notes it, the Court finds that Paragraph 2 constitutes a forfeiture clause under either party's interpretation. All agree that Aon had largely earned its brokerage once the reinsurance policies were placed at the beginning of the reinsurance year; accordingly, the Net Brokerage amount (and thus the Annual Fee) would seem to be largely "earned" at that point. Under Aon's construction, Homeowners Choice loses the Annual Fee if it does anything during the Agreement Year to change the parties' indefinite relationship; under Homeowners Choice's, it loses the Fee if it switches brokers for its 2009-2010 contracts during that year. Either way, Homeowners Choice seems to lose something that it had already substantially "earned." Therefore, avoiding forfeiture is insufficient reason to adopt Homeowners Choice's construction as a matter of law.

Homeowners Choice also argues that Aon's construction makes Paragraph 2 an impermissible penalty clause. This is so, it claims, because the sole purpose of a term that forces Homeowners

Insurance to continue its relationship with Aon in future years, on pain of losing the Annual fee, is to secure Homeowners Choice's compliance with the Agreement. *See* Pl.'s Mem. In Supp. of Summ. J. 10-11. However, Homeowners Choice's objection that Paragraph 2 extorts something *other than* compliance with the original obligation virtually concedes that Paragraph 2 is not a penalty clause as the cases use that term – an additional obligation owed because a party breached the primary underlying obligation in a contract. *Cf. River E. Plaza, L.L.C. v. Variable Annuity Life Ins. Co.*, 498 F.3d 718, 722 (7th Cir. 2007). (Homeowners Choice does not seem to believe that its construction of Paragraph 2 creates a penalty, even though it, too, would cut off Homeowners Choice's right to an Annual Fee in certain cases.)

Homeowners Choice is correct that, in claiming that Paragraph 2 was meant to compensate Aon for the loss of future revenue if Homeowners Insurance changed reinsurance brokers for 2010-2011, Aon essentially argues that it is a liquidated damages clause. Homeowners Choice is likewise correct that the Agreement lacks an express liquidated damages clause. Nonetheless, the Court finds that Aon's other argument – that Paragraph 2 is a condition, not a penalty or liquidated damages clause, carries the day. *Cf. Godare v. Sterling Steel Casting Co.*, 430 N.E.2d 620, 624 (Ill. Ap. Ct. 1981) (noting that a condition precedent is one which "is to be performed by one party to an existing contract before the other

party is obligated to perform.") "If the condition remains unsatisfied, the obligations of the parties are at an end." *McKee v. First Nat. Bank of Brighton*, 581 N.E.2d 340, 34 (Ill. App. Ct. 1991). The Court finds that the plain language of the Agreement Paragraph 2 creates an express condition on Aon's obligation to pay the Annual Fee. Ultimately, the Court need not adopt Homeowners Choice's interpretation in order to avoid an impermissible penalty or forfeiture.

### b. Illinois Reinsurance Intermediary Act

The Illinois Reinsurance Intermediary Act ("IRIA"), 215 Ill. Comp. Stat. 100/5 *et seq*.), § 100/15 provides: "Transactions between an intermediary broker and the insurer it represents . . . shall be entered into only under a written contract, specifying the responsibilities of each party. The contract shall, at a minimum, [provide] that: (1) The insurer may terminate the intermediary broker's authority at any time."

The parties agree that Illinois law entitles Homeowners Insurance to change brokers at any time. Any "penalty" imposed for doing so, Homeowners Choice argues, undermines the statute's protections; if brokers can maintain higher prices but remit part of their commissions contingent on reappointment, it argues, they can manipulate the market that the IRIA regulates. Because Aon's interpretation of Paragraph 2 penalized Homeowners Choice for changing agents, therefore, it contravenes the IRIA.

Aon argues that the IRIA does not apply, because the Agreement arose between Aon and Homeowners Choice, which is not an insurer. This cannot be so, Homeowners Choice argues, as that would simply be an end-run around IRIA. Absent more information about the relationship between Homeowners Choice and Homeowner's Insurance, however, the Court is inclined to agree with Aon.

In any event, Homeowners Choice's argument proves too much. If it is correct that the IRIA applies and undermines any agreement which discourages an insurer from changing brokers, the entire Agreement, not just Aon's interpretation of Paragraph 2, would be in jeopardy. After all, as noted above, Homeowners Choice's own interpretation creates a disincentive for insurers to switch brokers completely in midyear; if Homeowner's Insurance had changed who serviced their 2009-10 policies midyear, it would have lost its entitlement to an Annual Fee.

Homeowners Choice also objects that Aon may not split its compensation agreement with Homeowner's Insurance into two agreements, so that the Contract with Homeowners Insurance complies with Illinois law, but contains rates that are not competitive without the accompanying Agreement with Homeowners Choice. However, once Homeowners Choice's forfeiture and penalty arguments are rejected, it is difficult to see how the result here would be any different if the Contract and Agreement were executed in a single agreement containing (as the Contract does) the requisite

provision.  Indeed, if Homeowners Choice is correct that the IRIA applies to the Agreement, conditional (or at least sequential) performance may be the only way lawfully to structure a year-(or more) long incentive agreement such as this one – and neither party argues that the Agreement was wholly invalid.

Accordingly, the Court concludes that, at least on the current record, the IRIA does not compel it to adopt Homeowners Choice's construction as a matter of law.

## IV.  CONCLUSION

For the reasons stated herein, the parties' Cross-Motions for Summary Judgment are denied.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　United States District Court

**DATE:** 9/10/2012