**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

HOMEOWNERS CHOICE, INC.,

                 **Plaintiff,**

      v.

AON BENFIELD, INC.,

                 **Defendant.**

**Case No. 10 C 7700**

**Hon. Harry D. Leinenweber**

## MEMORANDUM OPINION AND ORDER

Before the Court for decision are the trial record and post-trial briefing of Plaintiff Homeowners Choice, Inc. and Defendant Aon Benfield.

For the reasons stated herein, the Court finds in favor of Plaintiff Homeowners Choice Inc. and awards the sum of $744,402.06. The Court enters the following Findings of Fact and Conclusions of Law pursuant to FED. R. CIV. P. RULE 52(a)(1).

### I.  FACTUAL BACKGROUND

This case stems from a dispute over a reinsurance contract. Reinsurance is a transaction where a reinsurer agrees to indemnify or reimburse an insurance company (the reinsured) against all or part of a loss the insurance company sustains under the policies it has issued. In exchange for the reimbursement, the insurance company pays the reinsurer a

premium.  In order to facilitate a reinsurance transaction, generally an insurance company must appoint a reinsurance broker as its "broker of the record."  After being appointed, the broker of the record obtains reinsurance policies and services those policies on the insurance company's behalf.  Reinsurance companies earn commissions on the policies they secure for an insurance company.

## A.  The Parties

Plaintiff Homeowners Choice, Inc. ("Homeowners") is a publicly traded Florida corporation.  It has a number of subsidiary companies - one of which is Homeowners Choice Property and Casualty Insurance Company ("Homeowners Insurance").  Homeowners Insurance is engaged in the business of selling property and casualty insurance to Florida homeowners.  Homeowners Insurance reinsures its insurance portfolio through the purchase of reinsurance.  At all relevant times of this dispute, Frank McCahill ("McCahill") was the President and Chief Executive Officer of Homeowners and Perish Patel ("Patel") was the Chairman of the Board of Directors.

Defendant Aon Benfield, (hereinafter, "Aon" or "Benfield") is an Illinois corporation that provides, among other things, insurance risk management services and brokers reinsurance.  Homeowners first appointed Aon as its "broker of the record" in 2007.  Homeowners renewed its agreement with Aon in 2008 and

again in 2009. This case concerns the Broker Authorization Contract the parties entered into in 2009.

### B. Negotiations Leading to the 2009 Brokers Authorization Contract

In approximately October 2008, the parties began to engage in negotiations regarding the renewal of their 2008 Brokers Authorization Contract for the 2009-2010 fiscal year. This was not an uncommon period of time for negotiations to occur, as it is typical for casualty and property insurance companies in Florida to secure their reinsurance contracts between May and July, before Florida's hurricane season. It is also common for insurance companies to request proposals from a number of reinsurance brokers months before they select which reinsurance company to name as its broker of record. The proposals reinsurance brokers submit provide insurance companies an explanation of the services the broker can offer and what the premium will be for such services.

At the time Homeowners and Aon began negotiations for the 2009 Contract, Homeowners was experiencing significant growth. Aon recognized this and recognized its ability to earn a substantial amount of commissions as Homeowners' broker of record. Thus, Aon sought to secure its role as Homeowners' broker of record as soon as possible, and for as long as possible.

In the early stages of negotiations, Homeowners proposed to renew its agreement with Aon if Aon agreed to enter into a Revenue-Sharing Agreement ("RSA") with Homeowners. Under the proposed RSA, Aon would pay Homeowners a portion of the commissions it earned from placing Homeowners' reinsurance.

Aon agreed to consider the possibility of incorporating a RSA into the 2009 Brokers Authorization Contract and on November 8, 2008 sent Homeowners a draft agreement ("the draft agreement"). The draft agreement provided that Aon would continue as Homeowners' broker of record and would allow Homeowners to share a portion of the revenue Aon earned from the placement of reinsurance policies. The draft agreement proposed to extend the brokerage relationship to either a three-year or a five-year term.

After McCahill received the draft agreement and learned the agreement was for multiple years, he rejected the offer. McCahill informed Aon he was not interested in any agreement that bound Homeowners for a period of longer than one year.

After this, negotiations between the parties continued. During this time, however, Homeowners was receiving proposals from other reinsurance brokers. Notably, in early February 2009, Aon learned that one of its competitors, Willis Insurance, made a presentation to Homeowners regarding the reinsurance services it could offer for the 2009-2010 fiscal year. After learning

this, Aon immediately began to coordinate a meeting with Homeowners to make a similar presentation.

On February 24, 2009, McCahill and Patel met with a number of Aon representatives at a restaurant in the Tampa Airport in Florida. The purpose of the meeting was to discuss Aon resuming its role as Homeowners' broker of record and discuss a RSA that was amenable to both Homeowners and Aon. Those present at the meeting from Aon included, Jeff Jones ("Jones"), the reinsurance broker Homeowners had been working with since 2007, Bill Fleischhacker ("Fleischhacker"), Jones' supervisor, and Rob Bredahl ("Bredahl"), one of Aon's top executives.

During the meeting, Bredahl initially proposed an arrangement similar to that described in the draft agreement which involved a multi-year agreement between the parties. McCahill and Patel again rejected this proposal and explained Homeowners was only interested in entering a one-year agreement. At this point, Bredahl countered with a one-year reinsurance agreement that allegedly included a one-year RSA. The agreement was to begin June 1, 2009 and end May 31, 2010. McCahill and Patel orally accepted this offer on behalf of Homeowners.

The day after the meeting, McCahill and Jones exchanged emails to confirm the terms of the oral agreement the parties reached in Tampa. Both emails stated that the parties had agreed on a one-year arrangement and confirmed that the agreement

included a one-year RSA.  Jones informed McCahill that Aon would formalize this agreement in writing.

### C.  The 2009 Brokers Authorization Contract

On or about April 29, 2009, Aon sent McCahill a Brokers Authorization Contract ("the 2009 Contract") which purported to memorialize the agreement the parties reached in Tampa in February 2009.  Shortly after receiving the agreement, McCahill signed it and returned a signed copy to Aon.

In relevant part, the 2009 Contract provides:

> Based on the desire of the parties to establish a long-term mutually beneficial relationship, this Agreement ("Agreement") is entered into on this 31st day of March 2009, between Aon . . . and Homeowners Choice, Inc., including its affiliates . . . ("Client"), under the following terms and conditions:
>
> 1.  In consideration for Client [Homeowners] appointing Aon Benfield as reinsurance intermediary-broker for the placement and servicing of all reinsurance purchased by the Client (the "Subject Business") for the annual period beginning on June 1, 2009 and ending on May 31, 2010 (an "Agreement Year"), [Aon] agrees to share with Client [Homeowners] received and earned brokerage revenue derived from the Subject Business, excluding any brokerage paid to corresponding brokers including those affiliated with [Aon] or sub-brokers ("Net Brokerage Revenue") by paying Client [Homeowners] an annual fee ("Annual Fee") for the Agreement Year to be calculated as set out in Schedule A.
>
> 2.  No Annual Fee shall be due for any Net Brokerage Revenue derived from the Subject Business that is less than $1,000,000, **nor**

**shall an Annual Fee be payable subsequent to
any decision by Client [Homeowners] to
terminate or replace [Aon] as its
reinsurance intermediary-broker for any
portion of the Subject Business.** In
addition, in the event [Aon] is terminated
as Client's [Homeowners'] reinsurance
intermediary broker for any Subject Business
prior to the end of the Agreement Year,
Client [Homeowners] shall promptly reimburse
[Aon] for all Annual Fees previously paid by
[Aon] under this Agreement. Client
[Homeowners] agrees to reimburse [Aon] for
any and all costs and expenses associated
with collecting any reimbursement. . . .

Pl.'s Ex. 1 at 1 (emphasis added).

Pursuant to the 2009 Contract, Aon resumed its role as
Homeowners' broker of record for the 2009 fiscal year. It is
undisputed that Aon remained Homeowners' broker of record until
May 31, 2010, the date the 2009 Contract expired.

Homeowners' interpretation of paragraph two was that
Homeowners would receive an annual fee so long as it did not
replace or terminate Aon before the 2009 Contract expired. Aon
contends that the same paragraph required Homeowners to renew the
2009 Contract with Aon before it was entitled to its annual fee.

### D.   Negotiations for Renewing the 2009 Contract

In the fall of 2009, (while Aon remained Homeowners' broker
of record pursuant to the 2009 Contract), Homeowners requested
proposals from several reinsurance brokers, including Aon. In
requesting these proposals, Homeowners specifically asked brokers
to include some type of RSA in their presentation. Homeowners

received proposals from Aon and TigerRisk, one of Aon's competitors.

Homeowners received Aon's proposal around January 8, 2010. In this 297-page proposal, Aon included a section titled, "Compensation Structure." This section included a discussion of a proposed RSA for 2010-2011. The final paragraph referenced the 2009 Contract Aon had with Homeowners. In relevant part, it read, "[a]s with the expiring Agreement, please note that the provisions are intended to only include brokerage earned by Aon Benfield . . . are [sic] payable to Company [Homeowners] at the end of each treaty year, in the event that Aon Benfield remains as broker for the subsequent contract year." Pl.'s Ex. 17 at 119.

Homeowners noticed this language in the proposal, but thought it was of little significance since the document was only a proposal for 2010, and not a binding document that could not impact the 2009 Contract the parties executed nearly nine months prior. Thus, Homeowners never communicated any concerns to Aon with respect to this provision affecting its entitlement to the annual fee in the 2009 Contract.

Over the next months, Aon's representatives communicated with Homeowners several times to try and secure the renewal as its broker of record for the 2010. During these communications, Homeowners contends Aon never mentioned anything with respect to

a forfeiture of the annual fee under the RSA in the 2009 Contract if it chose another reinsurance broker for 2010.

Ultimately, on or about March 10, 2010, Homeowners informed Aon that it had chosen TigerRisk as its reinsurance broker for 2010. McCahill emailed Jones to notify him that after May 31, 2010 (the date the 2009 Contract expired), Homeowners would be using TigerRisk as its broker of record. Jones responded to this email, but failed to mention anything regarding the fact that Homeowners would forfeit its right to the fees owed under the RSA in the 2009 Contract as result of its decision.

On May 14, 2010, Homeowners notified Aon that it was owed $659,943 under the RSA pursuant to the 2009 Contract. Aon responded that under paragraph 2 of the 2009 Contract, it owed Homeowners nothing since Homeowners chose not to renew Aon as its broker of record for 2010.

### E. Procedural History

On December 3, 2010, Homeowners filed the instant suit in this Court claiming Aon was liable for breach of contract and unjust enrichment. ECF No. 1. On January 31, 2012, the parties filed Cross Motions for Summary Judgment. In its Motion, Homeowners argued that it was entitled to the annual fee under the RSA because Aon remained Homeowners' broker of record until May 31, 2010, the Contract's expiration date. In Aon's Motion, it argued that it was entitled to judgment as a matter of law

because paragraph 2 of the 2009 Contract provided that Homeowners would not receive any payments under the RSA if it terminated or replaced Aon as its broker of record in 2010.

This Court granted Aon's Motion for Summary Judgment on Homeowners' unjust enrichment claim. ECF No. 56. With respect to the breach of contract claim, the Court denied both summary judgment motions, determining that the RSA provision in the 2009 Contract was ambiguous. In finding this ambiguous, the Court held that an issue of material fact remained with respect to meaning of the term "Subject Business" in paragraph 2 of the 2009 Contract.

On March 12, 2012, the Court began a two-day bench trial. Both Homeowners and Aon presented testimony with respect to their interpretation of the 2009 Contract and the term "Subject Business." After the trial concluded, the Court directed the parties to submit post-trial briefs.

## II. **DISCUSSION**

Pursuant to Federal Rule 52, the Court enters the following written Findings of Fact and Conclusions of Law based upon consideration of all the admissible evidence as well as this Court's own assessment of the credibility of the trial witnesses. To the extent that any Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as

Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## A.  Findings of Fact

### 1.  The Parties' Prior Transactions

First, it is undisputed that Homeowners appointed Aon as its broker of the record in 2007 pursuant to a one-year agreement. Then, in 2008, Homeowners renewed the 2007 agreement for a one-year term.  Finally, in February 2009, the parties agreed to renewing their 2008 agreement for yet another one-year term.

### 2.  The Drafter of the 2009 Contract

Next, it is clear that Aon's general counsel, Daniel Eldredge, was the individual who drafted the 2009 Contract.  It is equally clear that neither McCahill nor Patel made a single change to the written 2009 Contract prior to signing it.

### 3.  Homeowners' Intent

After considering the evidence adduced at trial, it is evident that Homeowners sought to enter into a one-year agreement with Aon for the 2009-2010 fiscal year.  The Court also finds Homeowners intended the 2009 Contract to include a one-year RSA. These findings are supported by Homeowners rejection of Aon's November 2008 draft agreement and its rejection of Bredhal's initial offer at the February 2009 meeting in Tampa, Florida. *See* Ct. Tr. 3/12/13 McCahill Direct at 36 (stating that "[o]n numerous occasions, I discussed with the personnel at Aon

Benfield that a multiyear risk sharing agreement was totally unacceptable, and on many occasions I advised them to cease and desist even bringing the topic up."); *see also* Ct. Tr. 3/13/13 Jones Direct at 211 (explaining "Rob Bredhal said: We can take the three-year deal that we offered you before, and we can make that a one-year deal.").

This finding is further supported by the emails exchanged between McCahill and Jones immediately after the February 2009 meeting. Notably, on February 25, 2009, McCahill emailed Jones stating: "Jeff: Good meeting. A few follow-ups: We agreed to a "one-year" commission sharing arrangement." Pl.'s Ex. 6.

Thus, the Court finds Homeowners intended the 2009 Contract to include a one-year RSA that was payable to Homeowners at the end of the Contract term regardless of who it chose as its broker of record in 2010.

### *4.  Aon's Intent*

With respect to Aon's intent, the Court finds the evidence adduced to be a mixed bag. It is undeniable that Aon presented testimony that it intended the RSA in the 2009 Contract to be contingent upon Homeowners naming Aon as its broker of record in 2010. *See* Ct. Tr. Jones Direct 3/13/13 at 213 (stating "Rob Bredahl expressed . . . that [sic] revenue sharing agreement would allow there to be a stickiness factor between Homeowners Choice and Aon Benfield. So it would allow the relationship to

continue.  It would provide an incentive for the relationship to continue."); *see also* Ct. Tr. 3/13/13 Jones Direct at 221-222 (explaining that Aon told Homeowners it needed to consider the difference in premium payments as well as their forfeiture of the RSA when it determined whether to renew Aon in 2010).

This intention is also illustrated by the proposal Aon sent to Homeowners in January 2010.  In relevant part, it read, "[a]s with the expiring Agreement, please note that the provisions are intended to only include brokerage earned by Aon Benfield . . . are [sic] payable to Company [Homeowners] at the end of each treaty year, in the event that Aon Benfield remains as broker for the subsequent contract year."  Pl.'s Ex. 17 at 119.

However, this evidence is contradicted by the email communications Jones had with McCahill the day after the oral agreement was reached in Tampa in February 2009.  That email was in response to McCahill's email which sought to confirm, among other things, that Aon and Homeowners had agreed on "a one-year commission sharing arrangement" in Tampa.  Pl. Ex. 6.  In his response to McCahill, under the heading, "Revenue Sharing Agreement (RSA)," Jones wrote, "[a]s we discussed, Aon Benfield has offered and HCI [Homeowners] has accepted to continue our relationship through at least, its June 1, 2009 reinsurance renewal.  Our relationship during this timeframe (*i.e.*, the June

1, 2009 reinsurance renewal) will include a RSA, which we [sic] formalize in the near future, calculated as follows . . ."  Pl. Ex. 5.  This email fails to mention anything with respect to Aon's intention that the fees earned under the RSA were contingent on Homeowners renewing Aon as its broker of record in 2010.  Indeed, this language is similar to that in the 2009 Contract, which also fails to express Aon's intentions to make the annual fee contingent upon renewal.  In relevant part, the Contract states:

> [N]or shall an Annual Fee be payable subsequent to any decision by Client [Homeowners] to terminate or replace [Aon] as its reinsurance intermediary-broker for any portion of the Subject Business. In addition, in the event [Aon] is terminated as Client's [Homeowners'] reinsurance intermediary broker for any Subject Business **prior to the end of the Agreement Year**, Client [Homeowners] shall promptly reimburse [Aon] for all Annual Fees previously paid by [Aon] under this Agreement. . . .

Pl.'s Ex. 1 at 1 (emphasis added).

Paragraph one of the 2009 Contract purports to define "Subject Business" and "Agreement Year."  The first line of paragraph one reads,

> [i]n consideration for Client [Homeowners] appointing Aon Benfield as reinsurance intermediary-broker for the placement and servicing of all reinsurance purchased by the Client [Homeowners] ("the Subject Business") for the annual period beginning on June 1, 2009 and ending on May 31, 2010 (an "Agreement Year"), Aon Benfield agrees to share with Client [Homeowners] Aon

> Benfield's received and earned brokerage
> revenue derived from the Subject
> Business . . .

*Id.*

In its post-trial brief, Aon argues these paragraphs reflect Aon's clear intent to have the RSA be contingent upon Homeowners' renewal of the 2009 Contract.  However, the paragraphs are void of any language that states unambiguously the RSA was contingent on renewing Aon as a reinsurance broker in 2010.

Instead, the 2009 Contract expressly defines the Agreement Year as the time period of June 1, 2009 to May 31, 2010.  As previously mentioned, it is undisputed Aon remained Homeowners' broker of record during that time.

Thus, the Court finds that while Aon's subjective intent at the time the 2009 Contract was executed may have been for the RSA to include a contingency of renewal, this was not an objective intent communicated to Homeowners at the time the contract was executed.  It was not until nine months after the 2009 Contract was executed when Aon sent its 2010 proposal to Homeowners that Aon made its objective intent apparent.  *See* Pl.'s Ex. at 119. This evidence is afforded less weight than the negotiations the parties engaged in February 2009 meeting, and around the time Homeowners signed the 2009 Contract in April.  *See generally, Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008) (stating that Illinois law follows an objective view of intent

and a party's outward manifestations of their intent governs);
*see also*, *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.,* 284 F.3d 693, 701 (7th Cir. 2002) (stating that the most relevant extrinsic evidence of intent is evidence of the parties' negotiations at the time the contract was executed).  Thus, the Court finds Aon's objective intent ambiguous with respect to the renewal contingency in the RSA.

### 5.  *The Interpretation of "Subject Business"*

After reviewing the evidence, the Court finds that the term "Subject Business" means all reinsurance the purchased by Homeowners for the time period beginning on June 1, 2009 and ending on May 31, 2010.  While Aon argues that "Subject Business" should mean all reinsurance purchased by Homeowners, including those after May 31, 2010, the Court disagrees.  The objective evidence surrounding Homeowners' intent to enter into a "one-year commission sharing arrangement" was clear in the February 25, 2009 email McCahill sent to Jones.  Pl.'s Ex. 6.  The best evidence Aon presented regarding its intent for its proposed definition was the proposal Aon sent Homeowners nine months after the 2009 Contract was executed.  The Court finds this evidence less persuasive than the email communications that were exchanged one day after the parties met in February and two months before the 2009 Contract was executed, and therefore finds that the

parties objectively intended "Subject Business" to include only the reinsurance purchased from June 1, 2009 to May 31, 2010.

### 6. The Interpretation of Paragraph 2

In light of the Court's conclusion that "Subject Business" means all reinsurance contracts Homeowners purchased between June 1, 2009 and May 31, 2010, the Court finds the forfeiture clause in paragraph two would have applied only if Homeowners had terminated or replaced Aon as its broker of record prior to May 31, 2010. *See* Pl. Ex. 1. It is undisputed that Aon remained Homeowners' broker of record until May 31, 2010. As such, Homeowners did not terminate or replace Aon for any portion of the Subject Business.

### B. Conclusions of Law

Neither party disputes that Illinois law governs the interpretation of the 2009 Contract. To prevail on a breach of contract claim under Illinois law, Homeowners must establish: (1) the existence of a valid and enforceable contract; (2) substantial performance of the contract by Homeowners; (3) a breach by Aon; and (4) resultant damages. *TAS Distributing Co. v. Cummins Engine Co.,* 491 F.3d 625, 631 (7th Cir. 2007). Homeowners has the burden of establishing the existence of a contract. *Bowers v. Jones*, 978 F.2d 1004, 1013 (7th Cir. 1992).

Here, the Court finds Homeowners has met its burden in proving the existence of the 2009 Contract. *See* Pl.'s Ex. 1. Moreover, since Aon remained Homeowners' broker of record until May 31, 2010, when the 2009 Contract expired, the Court finds Homeowners has substantially performed under the 2009 Contract. Assuming Homeowners proves Aon breached the 2009 Contract, it is clear that Homeowners has sustained damages. Therefore, the only element of Homeowners' *prima facie* case that requires discussion is whether Aon breached the contract.

In the Court's summary judgment ruling, it found the term "Subject Business" ambiguous. See ECF No. 56 at 7-8. In Illinois, construing an ambiguous contract is a question of fact. *See Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2011). When the Court determines that a contract or portion thereof is ambiguous, the Court is permitted to consider extrinsic evidence of the parties' intent. *Id.* Indeed, Seventh Circuit instructs that the Court's goal in construing an ambiguous contract is "to give effect to the intentions of the parties at the time they entered into the contract." *Tranzact Technologies, Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 546 (7th Cir. 2004).

After examining all the evidence adduced at trial, and making the aforementioned Findings of Fact, the Court holds that Homeowners has met its burden in establishing Aon breached the 2009 Contract.

This is conclusion is also supported by the doctrine of *contra proferentem*, which states that ambiguous provisions of a contract are construed against the drafter. *See Id.* n.2 citing *Ancraft Prods. Co. v. Universal Oil Prods. Co.*, 427 N.E.2d 585, 588 (Ill. App. Ct. 1981). Aon argues the doctrine of *contra proferentem* is inapplicable since Homeowners and Aon are two sophisticated parties that participated in an arms-length transaction. The Court disagrees.

While the Seventh Circuit has stated that "the argument for *contra proferentum* is pretty feeble when the policyholder is a sophisticated commercial enterprise rather than an individual consumer," in the same breath it noted that some states, including Illinois, do not limit *contra proferentum* to insurance policies sold to commercially unsophisticated parties. *Farmers Auto. Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976, 977 (7th Cir. 2007). In fact, the Illinois Supreme Court has held that "any insured, whether large and sophisticated or not, must enter into a contract with the insurer which is written according to the insurer's pleasure by the insurer." *Outboard Marine Corp. v. Liberty Mutual Ins. Co.,* 607 N.E.2d 1204, 1219 (Ill. 1992). Because of this, and because of the fact that there is generally little negotiation over the language in insurance contracts, the Illinois courts apply the doctrine of *contra proferentum* even with sophisticated parties. *Id.*

In this case, it is undisputed that Aon and Homeowners engaged in oral negotiations regarding the terms of the 2009 Contract. Indeed, such negotiations provided a substantial amount of evidence with respect to the intention of the parties at the time the 2009 Contract was executed. However, the evidence revealed Aon was the only party responsible for drafting the 2009 Contract. Patel testified that Bredahl told him that Aon would draft the Contract since Aon had lawyers who had expertise in drafting RSA's. Ct. Tr. 3/13/13 Patel Direct at 141. Moreover, when asked why he failed to have one of Homeowners' lawyers examine the 2009 Contract before he signed it, McCahill testified that in April 2009 Homeowners did not have any lawyers who were experts with insurance contracts. *See* Ct. Tr. 3/13/13 McCahill Redirect at 117 (stating at the time he signed the 2009 Contract, Homeowners had only one lawyer that was an SEC attorney.). In light of these facts, the Court finds the doctrine *contra proferentum* appropriate. If Aon intended to make the annual fee in the RSA contingent upon Homeowners' renewing Aon as its broker of record, Aon should have expressed this explicitly in the 2009 Contract. This is particularly true given Aon's alleged expertise in drafting RSA's.

The Court notes that even if it agreed with Aon and found *contra preferentum* inapplicable, the end result would be the same. This is because in Illinois, a party asserting a condition

precedent to a contract or a contract provision "bears the burden of establishing that the parties intended to create a condition at the time the contract was made." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 447 (7th Cir. 1998) citing *Wasserman v. Autohaus on Edens*, 559 N.E.2d 911, 916 (Ill. App. Ct. 1990).

Aon failed to adduce any evidence to indicate that at the time of contracting, Homeowners intended to create a contingency with respect to the RSA. Instead, the primary evidence Aon relies upon are paragraphs 1, 2, and 3 of the 2009 Contract. *See* Def.'s Post-Trial Memo. at 4-9.

Setting aside for a moment the Court's finding that Subject Business includes only reinsurance purchased from June 1, 2009 to May 31, 2010, it is undisputed that the Court previously held "Subject Business" to be an ambiguous term. This ambiguity is yet another reason that supports the Court's determination that the RSA in the 2009 Contract did not contain a contingency.

In Illinois, the courts do not construe a contract to have a condition precedent unless there is "language in the instrument [that] is unambiguous" or "the intent to create such a condition is apparent from the face of the agreement." *AAR Int'l, Inc. v. Vacances Heliades S.A.*, 202 F.Supp.2d 788, 800 (N.D. Ill. 2002) citing *Catholic Charities v. Thorpe,* 741 N.E.2d 651, 653-54 (Ill. 2000).

Here, there is neither unambiguous language nor a clear intent by both parties to create a condition or contingency to the annual fee under the RSA. Accordingly, the Court refuses to find the 2009 Contract required Homeowners to renew Aon as its broker of record before receiving its annual fee under the RSA.

Therefore, because the Court concludes that the annual fee under the RSA in the 2009 Contract was not contingent upon Homeowners' renewing Aon as its broker of record in 2010, the Court finds Aon has breached the 2009 Contract by failing to pay Homeowners its annual fee. Based on this Conclusion, Homeowners has proved its breach of contract claim and is entitled to damages.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court finds in favor of Plaintiff Homeowners Choice, Inc. on Count I, and awards Homeowners the sum of $744,402.06.

**IT IS SO ORDERED.**

_____
     Harry D. Leinenweber, Judge
     United States District Court

Date: 3/29/2013